Good afternoon. Illinois Appellate Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Michael B. Hyman presiding. Case number 22-1864, People v. Paul Zelewski. Good afternoon. I'm Justice Michael Hyman. With me is Justice Carl Anthony Walker and Justice Celia Gamras. Each side has 20 minutes. We'll conduct this as if we were in the courtroom, which means we may interrupt from time to time. And the appellant has time for rebuttal. Tell us how much time you wish to say for rebuttal. I would wish to say five minutes, Justice Hyman. All right, thank you. And say your name just so it's on the record. It's Stephen Brown on behalf of Appellant Paul Zelewski. Okay. And for the state? Good afternoon, Your Honors. David Iskowich on behalf of the people with the Cook County State's Attorney. Thank you. All right, Mr. Brown, you may proceed. Excuse me. I would like to first let the justices know that I will not be addressing the ineffective assistance counsel argument today. I'm going to focus on the other four. If you have any questions, I'm glad to answer them. But don't wait for it, I guess. The first argument I'd like to make is that Detective Ryan, a witness in this case, his testimony was impermissible lay witness opinion testimony that violated rule 701B of the Illinois Rules of Evidence. Specifically, the testimony in question relates to him narrating over certain surveillance footage, the Monti surveillance footage. But the judge put on certain parameters and he did abide by those parameters, didn't he? I would disagree that he did. He generally abide by those parameters. He generally kept his testimony to the most general terms, things that were obvious that any juror could have seen. And they were only included because it was a long video and, frankly, boring. So I could understand the trial court's interest in keeping the jury on task. However, the specific testimony in question was not an obvious observation. It was an inference that he drew from. What was the inference, for example, give us specific. OK, in this case, the jeep, which is the subject of all this, there's a jeep in a parking lot. It has a static reflection of a light off of its back window, which is to say. That's what your expert said. But there's a there's a light. Did he even call it? What did he call it? He said there are flashes of light. But I want to be clear that the light there was a light there before and that light then pulsed or flashed brighter. So this is what we're talking about. And from his testimony, we can see it's truly not something that a lay witness could know. You could not state that as an observation. And I don't believe that the experts stated it as an observation. It was only after hours and hours of careful analysis using specialized equipment that he was able to determine that it was not didn't originate from within the vehicle. But he didn't in going through that, he said he he placed it where to look. Isn't that what he did? He didn't characterize it. Your Honor, I mean, that's what I said, I'm just looking at the record. He did place it in time, yes, but he also stated that it came from within the passenger compartment of the vehicle. It wasn't merely that there's a brightening in the reflection on the side window of the Jeep. No, in fact, what he said was that it came from within the Jeep, which is an inference he made based on his assumption that it was a muzzle flash. Well, he didn't say muzzle flash. He did not. You're correct, he did not say muzzle flash, but the coding was clear enough that the state in presenting its closing argument did not feel the need to even draw that deduction for the jury, even though it was permitted to do so. It could have said they could have said, and here you can see muzzle flashes inside this Jeep. They replayed this section twice, they went back, did kind of a slow-mo, here it is again, and they did not think that it was unclear, muzzle or flashes of light were unclear when they meant to say muzzle flash. Wasn't that a decision for the jury to make, and so that if they didn't slow it down and he didn't make a reference to it, nobody would know what your expert was talking about. Indeed, the expert may never have been called if this testimony hadn't been made. Beforehand, so you had an expert ready to testify. There was an expert ready to testify, correct? And he did, in fact, testify, that is also true. But Mr. Brown, isn't it correct, though, that Officer Ryan never identified Mr. Zelowski in any parts of the video? So doesn't that kind of take it outside of 701? Justice Walker, that's true, he did not identify Zelowski, but his testimony doesn't have to be an identification in order for Rule 701 to kick in. And the Supreme Court case, Frieden-Gilkey-Roloff, Inc., versus Hamilton's 1985 case, which I cited two of my briefs, speaks to opinion testimony that is not involving an identification. It was, in that case, a man opining about the inevitability of a car crash. And the Supreme Court, in that case, found that because it was not helpful to the jury or the jury could come to that conclusion on their own, that it was invading the province of the jury and usurping their function as a finder of fact. It was, like here, planting a seed in the minds of the jury that something was or wasn't true, that wasn't based on fact, that was based on an interpretation of the fact. But here, the judge specifically said that this would be helpful to the juror. And doesn't the judge get a lot of discretion to make that finding? I, the judge does get discretion for those sorts of things. However, I believe this snuck under the radar. I believe this was something that the judge did not intend to come out based on his ruling prior to that. He specifically stated that he didn't want any testimony as to the specifics of what occurred, which is to say that he didn't want to have to hear testimony that someone is going into a car doing something, which my interpretation of that is that he doesn't want anything more than an indication that something's happening at that moment. Well, isn't that what he was doing by saying there is that light? Excuse me? That's what he was doing, wasn't it? When he referenced the light in that case, in fact, trial counsel for my client objected numerous times to any narration overtop any of the continuing objection. I understand continuing objection and the sidebar in question was before this specific testimony was elicited. It was just trial counsel had an issue with any narration at all, which is to say, saying, here's a car pulling in. Here's another car pulling in. We understand that. Okay. No, we're not arguing that he didn't preserve the objection. And here, the jury was free to reject or disregard any of that testimony that. As he went through the video, so as they are with any other witness, so what I'm just not sure that this actually falls under 701. Justice Walker in my response to you is that. Well, the jury does have the ability to disregard any evidence that it hears. It's still the court's duty to ensure that only the proper evidence gets in front of them in the 1st place. It's the reason that we exclude any evidence at all. And in this case, based on the. Reading holding and feeding as well as the 5th district holding people versus sites that shouldn't have occurred because the Ryan hadn't done had no additional insight into this video other than having watched it himself. And that's something that the jury was perfectly capable of doing on its own. And you realize, though, that in the, because you've agreed in your brief that the standard review here is abusive discretion. And we kind of give the judges pretty give them somewhat we give them deference, probably more deference than other standards. Do you tell us in what way you believe the judge abused the judges discretion? Well, I believe judge Gataldo abused his discretion in that his ruling went or the. Whether or not he intended that was his intention in his ruling. The actual testimony itself was clearly controverted the holding in people versus sites, which is a great in this case persuasive. Persuasive holding, wherein a witness testified over a video, and all they've done before is watched a better quality version of that video and the court found that because they did not have any, there was no aspect of their testimony. Couldn't could have been could not have been communicated to the jury effectively that their testimony was. Invading the province of the jury that they this testimony was. Duplicative of what the jury could have done, and it did it in the place of the jury. And that's why we feel it planted this seed in the mind of the jurors that resulted in my client's guilty verdict. Let me ask you, I know you said there were 3 issues you were going to talk about. The other issue is not not the ineffectiveness issue, but of all the issues. What is the most important? What is the 1 that you think is the. Home run here is is it this issue or is it another issue? It's this issue also the quashing of the search warrant is, I think, another very important issue for this court to address. You think, I mean, if you were going to win this case. The issue that really wins it for you. Is which, which I had believed it was this issue. Justice, I just want to make sure because you went with it 1st. I wanted to see if that was your. Yes, yes. So you don't believe that the fact that there was no evidence, no physical evidence that he's connecting. Mr to this crime, that's not that doesn't weigh as heavy. Is that what you're saying? I believe that that's an important aspect of whether or not this, this was a prejudicial. Error on the part of the court. That the fact that the evidence was closely balanced in this case. Is shows that this error resulted in prejudice to my client. I think that all of the evidence or lack thereof. Supplied by the state is of critical importance in the court's determination. And that it needs to be considered, especially in conjunction with these other arguments. You can the conclusion is closely balanced. I have yes, it is closely. I know how do you come to that conclusion? Well, your honor, there are several. Of dangling dangling. Springs leads what am I trying to say? There's some unresolved issues in this case. Specifically, we've got there's complete lack of physical evidence connecting my client himself. And it's a circumstantial case. But just to cut through it. We have cell phone data. Ballistics evidence. Evidence that and. I had a relationship. The bag of marijuana from his car resembled that found in his apartment. We have the testimony of the employees at Edison that wanted the gloves, gasoline and rags. Hours before. Escobar was seen murdered. We know that. There's. Video showing traffic camera footage, footage from surrounding businesses. It was admitted. In the. Smell of gasoline at the. Fire of the car. Again, how is this a close? Well, case, because 1, because there's evidence that this did not occur as the prosecution claimed it did for the jury to decide. And that jury to decide correct. But in this case, it was against the manifest way to the evidence. No, no, but that doesn't go. You said it's a close case. I'm trying to figure out how it's close. Considering all the circumstantial evidence in this case. When we have a photographs, if they have the jury believed that the man going back and forth. From the auto. Shop to the cars and then driving and then the phone. We know that. The murder victims phone was traveling along with. Same route. And they had phone calls. Um. And. There seems to be a lot of circumstantial evidence here that somebody could use again. Close cases. How do you define a close case? I define a close case is 1 where there is some evidence connected to my client, but there's also. Ample evidence that suggest my client did not commit this. This crime, and I'm speaking to the fact that. There's no blood spatter on my client after allegedly shooting. Ask about from a foot away. There's no he's wearing. He goes, he gets white gloves that are knit white gloves goes back into the. And also those there's no blood on those when he subsequently appears and adds an auto. Excuse me. Use me. So sorry. I'm speaking about. The. The. The bullet casings, there were 4 to 6 shots, supposedly shop and only 2 casings were found. 3 total were found. And it was suggesting that. There he is somewhere else. The police didn't extend. They didn't match. They didn't match. They didn't match. That's right. They were found in his home. Some were found in his home in the in the basement. Yes, that's correct.  I'm pretty sure I'm out of time now. If you'd like me to continue, I can, but. You have your 5 minutes. That's fine. If you want to. And also, if you have any questions. Okay. Thank you. Thank you. State. Thank you. Again, your honors. Mr. Brown may please the court. On issue 1. I think the court hit on through its questioning to my able opponent. Some of the highlights of the evidence and the law in this matter. As an initial matter, I think it bears repeating that. Detective Ryan not once ever testified that this. The flashes of lights were muscle flashes or that they were the result of a discharge of a firearm. He simply said that upon entering the vehicle, he saw what appeared to be flashes of light emanating from inside the vehicle. In addition, as Justice Hyman pointed out. His testimony on these points was quite limited. He was not allowed to identify the defendant. He was not allowed to identify the defendant's vehicle. He was not allowed to say that this was a drug deal, that this was even a crime scene. And so his testimony should be. Viewed under rule 7 to 1 within that really narrow context, factual context. But isn't it correct that he was in no better position to. Determine what's what's in the video than the jury would have been. The jury could have just watched the video without him narrating it. I understand your question, Your Honor. I think I would in response. I would turn the court's attention to the Thompson case, which is an Illinois Supreme Court case cited in the briefs extensively from 2017. That case dealt with. Lay opinion identification testimony. And the court held in that case. That when a witness testifies as to the identity of a person seen in that kind of footage. There have to be some additional safeguards to ensure that. The court and the trier of fact and the parties. Have some assurance that the witness who's making that identification. Is in a better position than the jurors to make that identification through his. Or her, for instance, prior familiarity with the person being identified. Now, there is an exception to that. It's important. So I'll point the court specifically to paragraph 61 of that case. There was a witness in that case who testified that he viewed for surveillance footage. And said that he only could identify he only identified the subject. In that video, he didn't identify the defendant in the video. He only said the subject appears to be doing this or that. The court said that under those circumstances. No additional assurances are necessary. To show that the witness has a better idea or a better understanding or a better. Ability to make the identification as the jury because no identification is made. So the defendant relies much upon the idea that. Detective Ryan had have some be in some better position than the jury to make this. To provide this testimony. But that that exception is carved out in Thompson. And so he did not need to be in a better position. Isn't Ryan in a better position? Because unlike the Thompson case, he is a police officer. And as a police officer, isn't his testimony going to have greater impact? Sure, I understand your question. This goes to one of the defendant's points. So I think that again, we need to look at what he testified to. He did not testify that as a police officer. I can tell you for sure, or I have a reasonable probability of believing that. In my experience with firearms, this was the flashes of light. Represented something like muzzle flashes. He didn't even say they represented something any untoward. Police officers, as your honors know, testify all the time about. With respect to exhibits. Um, the inferent and I did disagree with the my opponent on this point that he drew an inference in this respect. He didn't draw an inference. He only made a statement of opinion or fact, however you want to characterize it. And the jury was left with the wide discretion to decide whether to disregard that point. Or to believe may be part of it or to believe the defendant's expert even. So I understand the defendant's concern that his capacity in testifying as a police officer draws some concern. But it doesn't draw enough concern to say that his overall account or this particular piece of testimony in particular was problematic under 701. The cases he did cite in this respect, I think the SEPCA case and goodness. In other case, they're from the 1970s. They're older cases, and I think that they're. You also agree that Detective Ryan's status as a law enforcement officer. Also compounds any prejudice that there might be in terms of his walking them through the video. Your Honor, I don't know if I agree with that entirely. The jury was free to disregard his testimony, whether as a police officer. They might not have believed him as much as a police officer. Right? We don't know that. I don't think there's any compounding here where the nature of this testimony was really de minimis and was not responsive to any ultimate question of fact. It was merely an observation he made in his viewing of the video. Now back to Justice Hyman's question about being in a better position. If we do believe that he needed to be in a better position to point this out to the jury, that's also been satisfied here. The jury, recall, was watching this footage. And just to clarify, this is Exhibit 3. There's a lot of exhibits in this case. This is 375, which is a shortened version of Exhibits 32 and 33. Now, Exhibit 32 is Monty Camera 4 looking westbound down the drive. Monty 10 is kind of looking in a southwesterly direction. So the jury was looking at Exhibit 375, which took the shortened portions of 32 and 33 and put them up, what the state did is they put them up on like a split screen. And these were time stamped and date stamped. And they were also motion activated. And they played at the same time. So what the jury, and I looked at these in my office for hours and hours. And you have to, you know, you're watching both screens. And you're trying to see when the motion activation is working and when it's not. And sometimes one camera is still because there's no motion. And there's some motion on the other camera. They all do sync chronologically in the end. So Detective Ryan had the benefit that the jury didn't have of leading the investigation, securing this evidence, and then watching it, obviously, before the case present, the state presented its case in chief. So he was in a better position having observed the video already, having some familiarity with the layout of the geography, and having a better understanding of what the Monty cameras were capturing. And he didn't, he did not testify to any of the, as I noted, he did not testify that these were crimes being committed, or that there were muzzle flashes representing a firearm being discharged. He simply pointed out that he saw what appeared to be flashes of light and other instances where there was movement. I'm sorry, just a second. That's okay. You do concede in your brief, though, that identification of the gene was error. I do, yes, Your Honor. That went against the court's ruling that the witness should not identify people or vehicles. And we addressed Mr. Brown earlier. He didn't identify the officer, but he identified the vehicle. And we all agree that that's error. I have no choice but to say that that's error, as it was characterized as error in the court below. And it was the victim's Jeep, actually, that he identified. Very early in his testimony, he said that that's Esquivel's Jeep. The defense promptly and properly objected because it went against the court's pretrial order in that respect. The objection was sustained. And it's well settled that a prompt objection a sustaining of the objection and proper instruction to the jury to disregard the comment, which is what occurred here, is on balance adequate to forestall any notion that it's reversible error. And we also do believe that on merits aside, we have a very strong case for harmless error in this respect. Just a few points on that. First, again, Detective Ryan did not testify these were muzzle flashes. He only testified they were flashes of light. And the defendant actually called his own expert who testified, an actual expert on lighting and lighting technology and lighting reflectiveness, who testified at length that in his expert opinion, the lights were not coming from inside the vehicle, but were simply reflections from passing traffic or the door opening or the streetlights in the area caused by other movement of other vehicles. So the jury had two versions of what happened here and had the discretion as the trier fact to decide which to believe. In fact, the jury could have disbelieved Detective Ryan on this point and believe the defense expert and still concluded that the evidence was strong enough to convict. Or it could have believed that neither expert, neither the expert nor Detective Ryan were making any sense on any of these points. And it was quite irrelevant given the balance of the evidence. Also, to the extent that the defendant is challenging this part of the testimony on the basis that the shooting didn't occur inside the vehicle, we have very strong evidence suggesting that it did occur inside the vehicle because investigators found actual shell casings inside the vehicle. Also, the positioning of the body is important in this respect for purposes of determining where the shooting occurred. According to the record, the body, when it was discovered at midnight burning at Cinnamon Cove, it was positioned in a very unusual way. The body wasn't sitting in the driver's seat. The head of Mr. Esquivel's body was positioned on the passenger side floorboard. His mid-body was along the console of the car and his feet were kind of like sticking into the back of the car. Now, to believe that he was shot at Cinnamon Cove where the car ended up, one would have to believe that after he was shot, the shooter moved his body in this very odd position and then set the car on fire. It's implausible. What the more plausible version, which was presented to the jury, is that the victim was shot inside the vehicle, given the shell casings inside the vehicle. And then in order to take that car away from the site of the shooting, because recall, the defendant was positively identified at that time, at the scene of the shooting by the three employees of the Edison Body Shop, he felt the need to move the car somewhere else to get rid of the evidence. And in doing so, he needed to move that body in that position. So those two pieces of evidence, the positioning of the body and the shell casings in the vehicle, strongly support the theory that the defendant shot the victim in the car at that time and then moved the car to the Cinnamon Cove. What about the lack of blood on the white gloves and that he didn't have blood on him? Sure, your honor. So that goes to his sufficiency challenge, of course. And we all know the standard, we're all very familiar with that standard of viewing it in the light most favorable to prosecution. Could any rational trier fact found beyond a reasonable doubt, the elements of the fence. The lack of physical evidence in the case is black letter law, that that's not a determinator under the Jackson standard. The fact that there was no blood on his clothing or on any gloves or any other evidence. We are not supposed to take these facts and raise them to the level of reasonable doubt. In fact, looking at this evidence in the light most favorable to the prosecution, as I outlined in my brief, one could surmise that he cleaned the blood off of his sweatshirt or threw his sweatshirt away. Blood splatter in the vehicle, the lack of blood splatter on his clothes might be attributable to a shooting that didn't produce blood splatter in his direction. The car recall was burnt quite extensively. And that would have removed any further blood staining from the vehicle. They did find pools of blood on the floor. But to the extent there was not evidence of blood splatter, it doesn't dilute the state's case, especially given the balance of the other evidence, including the extensive video footage, including the compilation video, which succinctly put together the chronology of these events. The defendant was positively identified at the Addison Body Shop at the very time that the Esquivel and the defendant met there. The ballistics evidence, as Justice Hyman pointed out, that was discovered in the basement of defendant's home was an exact match to the shell casings that were found in the vehicle. The defendant's girlfriend testified that he left his apartment at 9.30 p.m. on the night of the murder. We have a phone call from Esquivel to the victim. I'm sorry, Esquivel to the defendant about 9.58 p.m. According to the videos, they rendezvoused on Addison Court about 10.02. The theory is that the defendant entered the vehicle, shot the shot the victim about 10.13. Around this point, he went into the body shop to retrieve. He actually went in there three times to get his drug bag, a bottle of water, rags, gloves, and gasoline. The eyewitness testimony of the three employees at the Addison Body Shop confirmed that the defendant was there between 10.00 and 10.30. They actually not only identified defendant there, but they also said that the defendant was there in his white Chevy Impala. In addition, I think that should suffice for the balance of evidence on the sufficiency challenge and viewing that in a light most favorable to state. Any rational trier of fact could have found him guilty on this very strong circumstantial case. I like to think of the evidence in this case less as links in a chain, and more like strands of a rope that intertwine. We have a lot of this evidence between the eyewitnesses, the video, the ballistics, the cell phone, it all intertwines to make a very, very strong, powerful case against the defendant. Are there any other questions? Just one question. You talked about Thompson and those additional safeguards. I know that you don't think that those were necessary, but what would be a sampling of those additional safeguards or assurances? Sure, Your Honor. In Thompson, the court said that if a law enforcement... There's two sets of safeguards. The first set of safeguards is for a non-law enforcement officer. Before a non-law enforcement officer identifies a person in a footage like this, the state needs to elicit testimony that this person had some familiarity with the defendant. It's not a very rigorous burden, but there's four or five examples of how this person might have familiarity from prior contacts, prior knowledge, acquaintances, et cetera. Then there's a second category of safeguards that apply to law enforcement officers only. Those safeguards entail what the court suggested that they didn't suggest. They instructed that before a law enforcement officer testifies to that, the court should probably, in most cases, hold a hearing outside the presence of the jury to ascertain the nature of those contacts and familiarity. The reason for that is because a lot of those prior contacts and familiarity with the defendant may entail overly prejudicial facts concerning prior contacts in the law enforcement and criminal context. Those are the two types of safeguards, law enforcement and non-law enforcement. However, as I noted earlier in my argument, there was no identification here, and so neither of those safeguards was necessary. Before I close out, Your Honor, I just want to mention, I did make one mistake in my brief. I want to point the court to, it's on page 19 of my brief, and I cited to Thompson, this goes to issue one, and I just did a quick parenthetical to Thompson where I said that when the law enforcement officer does not identify the defendant, but only as the subject, as occurred in Thompson, this was not identification testimony subject to the criteria in Rule 701. That is actually not correct. It is subject to Rule 701. What it's not subject to are these additional safeguards. That's what I meant to say there, and to the extent the court has any questions about that part of my brief, that was a mistake. I just wanted to point that out. Unless the court has any further questions, we request that the court affirm the judgment below. Thank you. Thank you, and thank you for taking that known to us correction. I appreciate it. Mr. Brown? There's a few issues I'd like to respond to from counsel's argument. The first is that Thompson excuses any additional caution here because there's no identification. We're talking about two separate parallel lines of law here. One of them is about opinion testimony, and the other one is opinion identification testimony. In this case, we have opinion testimony, which has been and continues to be subject to the requirement that it be helpful, and that that helpfulness arrives from the witness being in a position where they're unable to explain the basis of the facts that they're testifying to, or the basis of their opinion that they're testifying to. And here, again, there was no basis beyond watching the video, and so this part should call people versus psychs in determining whether this was error or not. And it's important. We do so because this was not a de minimis error, as counsel suggested. It was ultimately, though indirectly, an opinion as to the ultimate issues in this case. As counsel so clearly pointed out, the entire case is circumstantial, and it involves facing Zalewski and Esquivel at Addison Auto and the murder actually taking place there. If there were no gunshots, if the murder did not take place at Addison Auto, then there is no evidence that the appellant did this crime, committed this crime. So it's far from harmless. It's far from de minimis. This is actually quite an important opinion that was put out there, and it had a very potentially profound effect on the jury. As to the counsel's argument that Detective Ryan had gone through an entire investigation, well, that's Ryan's own fact-finding. That is him acting in his role as an investigator for the purpose of prosecuting crimes. He had done the fact that he had done his own fact-finding on this to be all the more reason to not trust his opinion, to see that his opinion, in fact, was not true. It was a fact, an opinion. It was not an observation of fact. It was colored by his own expectations and the rest of the information that he himself had weighed and not the jury. Finally, as for the specifics of the state's case, I don't know if this was in my brief or if it was implied somewhere, either of the briefs, but we're not arguing that the murder didn't take place in the Jeep. We're arguing that the Jeep was not necessarily at Addison Auto when the murder took place and my client wasn't in the Jeep when the murder took place. It's something that is important because when we're talking about bloodstains, we're talking about face evidence. We're not talking about the Jeep. We're talking about, because of course there's going to be blood in the Jeep. What we're talking about is in my client's car, the car that my client drove, which belonged to his mother. They took that car apart piece by piece and they looked for any trace that they might find and the video in question shows him going between the Jeep and his car at least once and he ultimately drives away in his mother's car and it doesn't make sense that there would not be any blood or any kind of other evidence, physical evidence in that car when there by all rights should be. There was so much blood in the vehicle at the time. It was found in a cove after the fire department had hosed it down. The water inside was still red. So it's beyond a reasonable doubt. That's a reasonable doubt that my client did not commit the crime. Additionally, excuse me. Additionally, the window not being still intact when the Jeep left Cinnamon Cove makes it very unlikely that a gun was fired within that Jeep. The fact that the window was gone at some point and that three bullet casing bullets were found within the Jeep itself suggests that the window was destroyed by a bullet and the fact that there was no remnant of any window at Cinnamon Cove where the fire occurred and there was no remnant of a window at Addis Auto and in fact, looking at the videos presented by the state entered into evidence, you can see that driver's side window flashes reflecting street light as it leaves Addis Auto only to eventually arrive at Cinnamon Cove. If there are no more questions, the appellant would like to just urge this court to reverse the trial court holding and remand this case for a new trial. Thank you. Thank you. Thank you to both of you for your excellent arguments and your briefs. We'll take the case under advisement and be deciding on it as soon as we can. So I appreciate it. Have a good holiday to both of you and have a good afternoon. Thank you. Thank you, Judge. Thank you.